J-S30031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MAIN STREET MANSION, LLC AND MAJESTIC MANSION, LLC, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KRISTIAN R. TOMASULO AND JOSEPH GRANDE, JR., | : | |
| | : | |
| Appellants | : | No. 2875 EDA 2017 |

Appeal from the Order Dated August 11, 2017
in the Court of Common Pleas of Bucks County
Civil Division at No(s): 2017-01261

| | | |
|---|---|---|
| MAIN STREET MANSION, LLC AND MAJESTIC MANSION, LLC, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KRISTIAN R. TOMASULO AND JOSEPH GRANDE, JR., | : | |
| | : | |
| Appellants | : | No. 2185 EDA 2018 |

Appeal from the Order Dated June 19, 2018
in the Court of Common Pleas of Bucks County
Civil Division at No(s): 2017-01261

| | | |
|---|---|---|
| MAIN STREET MANSION, LLC AND MAJESTIC MANSION, LLC, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KRISTIAN R. TOMASULO AND JOSEPH GRANDE, JR. | : | No. 2253 EDA 2018 |

Appeal from the Order Entered April 13, 2018
in the Court of Common Pleas of Bucks County
Civil Division at No(s): 2017-01261

BEFORE: PANELLA, P.J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED AUGUST 14, 2019**

Kristian R. Tomasulo ("Tomasulo") and Joseph Grande, Jr. ("Grande") (collectively, "Defendants") appeal from the Orders entered on August 11, 2017, which denied their Emergency Petition for Preliminary Injunction, and June 19, 2018, which entered monetary Judgment and Judgment in possession against Defendants. Main Street Mansion, LLC ("Main") and Majestic Mansion, LLC ("Majestic") (collectively, "Plaintiffs") cross-appeal from the Order entered on April 13, 2018, ejecting Defendants from certain property, and awarding damages to Plaintiffs.[1] We affirm.

In its Opinion, the trial court set forth the relevant factual and procedural history underlying these appeals, which we adopt as though fully stated herein. *See* Trial Court Opinion, 4/13/18, at 1-10.

Defendants now raise the following claims for our review:

A. Whether the trial court abused its discretion and violated due process in its pre-trial administration of the case[?]

B. Whether the trial court both erred legally and abused its discretion in rendering a verdict without taking account of Defendants' evidence or [the] law[?]

_____

[1] The separate appeals (docketed at Nos. 2875 EDA 2017, 2185 EDA 2018, and 2253 EDA 2018, respectively) were consolidated at 2875 EDA 2017. We note that Defendants have abandoned any argument relating to the denial of their Emergency Petition for Preliminary Injunction. Thus, the matter is not addressed herein and is included in the caption only by virtue of consolidation.

C. Whether Plaintiff[s] [were] entitled to judgment when [they] did not demonstrate [] compliance with the Lease and demonstrably breached it and inequitably exploited its breach[?]

D. Whether the trial court erred by subverting the law of quiet enjoyment[?]

Brief for Defendants at 4-5 (unnecessary capitalization omitted).[2]

> Our standard of review of a non-jury verdict is limited to determining whether the findings of the trial court are supported by competent evidence and whether the trial court committed an error in any application of the law.  We consider the evidence in a light most favorable to the verdict winner[,] and will reverse only if the trial court's findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

*Hornberger v. Dave Gutelius Excavating, Inc.*, 176 A.3d 939, 943-44 (Pa. Super. 2017) (internal citations and quotation marks omitted); *see also L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.*, 777 A.2d 1090, 1093 (Pa. Super. 2001) (stating that, in a non-jury trial, the fact-finder is free to believe all, part, or none of the evidence).

## DEFENDANTS' APPEAL

In their first claim, Defendants contend that the trial court violated their rights to due process by entering a case management Order, *sua sponte*, that restricted the timeframe for discovery.  Brief for Defendants at 19-21. Additionally, Defendants assert that the trial court precluded Defendants from

---

[2] We note that Defendants' fifth claim has been omitted, as it merely constituted a counter-statement of the question raised in Plaintiff's cross-appeal.

engaging in discovery, while affording Plaintiffs full discovery. ***Id.*** at 4, 21-24.

Defendants primarily focus on the language of Pa.R.C.P. 4007.3, which provides:

> Unless the court *upon motion*, for the convenience of parties and witnesses and in the interests of justice orders otherwise, methods of discovery may be used in any sequence and the fact that a party is conducting discovery, whether by deposition or otherwise, shall not operate to delay any other party's discovery.

Pa.R.C.P. 4007.3 (emphasis added); ***see also*** Brief for Defendants at 19-21.

Defendants' focus is misplaced. Rule 4007.3 addresses restrictions on the sequence and methods of discovery, not the overall timeframe during which discovery may be conducted. Nothing in Rule 4007.3 prohibits a trial court from establishing a discovery schedule to which both parties are bound and which affords adequate pursuit of discovery by the parties. Rather, the Rules of Civil Procedure contemplate the entry of such orders by the trial court. ***See***, ***e.g.***, Pa.R.C.P. 212.3 (providing that "[i]n any action at any time the court, *sua sponte* or on motion of any party, may direct the [] parties … to appear for a conference to consider … [t]he entry of a scheduling order.").

The second half of Defendants' first claim expounds upon the overarching principles of justice embodied in Pa.R.C.P. 126, which states, in relevant part, that the "rules shall be liberally construed to secure the just, speedy and inexpensive determination of [] action[s]…." Pa.R.C.P. 126. Defendants baldly claim that "[n]othing about the trial court's administration

of pre-trial proceedings comports with these requirements. The [trial c]ourt not only denied [Defendants'] discovery but fully indulged a strategy of [Plaintiffs] to aggress through discovery demands both pre-trial and in trial." Brief for Defendants at 22.

Defendants fail to cite to any authority or evidence illuminating the trial court's purported violations of Rules 4007.3 or 126. At most, Defendants support their argument with a generic citation to the Rules themselves, a note to "See Docket." Brief for Defendants at 22-23. Therefore, this claim waived. **See Commonwealth v. Murchinson**, 899 A.2d 1159, 1162 (Pa. Super. 2006) (holding that a claim was waived on appeal where the appellant failed to develop meaningful argument).

Moreover, were we to address the merits of Defendants' claim, we would agree with the trial court's analysis as to why Defendants' due process rights were not violated, and would affirm on that basis as to Defendants' first claim. **See** Trial Court Opinion, 4/13/18, at 23-25.

In their second claim, Defendants contend that the trial court did not adequately consider the evidence presented by Defendants "insofar as the trial court did not adjudicate but advocated exclusively to vindicate [] Plaintiff[s]…." Brief for Defendants at 4. Defendants claim that the verdict "has no correspondence with competent evidence" and "improperly shunts all of the law centered on the implied covenant of quiet enjoyment…." **Id.** at 24. Defendants emphasize that the trial court made independent factual

determinations, rather than adopting or being guided by Defendants' or Plaintiffs' Proposed Findings of Fact. *Id.*

Upon review, we agree with the trial court's analysis and conclude that, viewing the evidence in the light most favorable to Plaintiffs, the trial court's verdict is supported by the record and is not the result of legal error or an abuse of discretion. *See* Trial Court Opinion, 4/13/18, at 13-19, 25-27. Thus, we affirm on this basis as to Defendants' second claim. *See id.*

In their third claim, Defendants contend that the trial court erred by disregarding that the evidence unquestionably demonstrated that Plaintiffs deliberately breached their obligation to transfer Majestic's liquor license with the purpose of severely damaging Defendants. Brief for Defendants at 4, 28-31. Defendants' argument centers on Plaintiffs' alleged breaches of the Lease—*i.e.*, Plaintiffs' failure to convey a valid liquor license, as well as the professed constructive eviction of Defendants. *Id.* at 28-31. Defendants claim that such breaches entitled them to withhold rent and preclude Plaintiffs from recovering the same. *Id.*

Upon review, we agree with and adopt the trial court's analysis and conclusion that, viewing the evidence in the light most favorable to Plaintiffs, the verdict is supported by the record and is not the result of legal error or an abuse of discretion. *See* Trial Court Opinion, 4/13/18, at 13-22, 25-29. Thus, we affirm on this basis as to Defendants' third claim. *See id.*

In their fourth claim, Defendants contend that the trial court ignored explicit provisions of the Lease as well as the body of law protecting tenant interests. Brief for Defendants at 5, 31-33. Specifically, Defendants claim that the trial court erred in finding that the Lease was entered into "as is." *Id.* Further, Defendants argue that the trial court erred in determining that an "as is" lease bars assessment of a landlord's interference with quiet enjoyment. *Id.*

We initially note that, contrary to Defendants' assertion, the trial court did not rely on the "as-is" language of the Lease to exclude consideration of their claim to quiet enjoyment. Instead, the trial court considered the claim and found the argument unconvincing, based on the evidence of record. *See* Trial Court Opinion, 4/13/18, at 13.

Upon review, we agree with the trial court's analysis and conclude that, viewing the evidence in the light most favorable to Plaintiffs, the trial court's verdict is supported by the record and is not the result of legal error or an abuse of discretion. *See* Trial Court Opinion, 4/13/18, at 13-19, 25-27. Thus, we affirm on the basis of the trial court's Opinion as to Defendants' fourth claim. *See id.*

**PLAINTIFFS' CROSS-APPEAL**

Plaintiffs raise the following question for our review:

Whether, following a hearing and after finding that landlord Main [] is the owner of all ownership interests of tenant Majestic [], the trial [c]ourt erred by not finding that individual guarantors[, Tomasulo and Grande,] lacked standing to advance [c]ounterclaims for breach of a fully integrated written lease to which neither [Tomasulo nor Grande] were individual parties?

Brief for Plaintiffs at 3.

"Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary." ***Rellick-Smith v. Rellick***, 147 A.3d 897, 901 (Pa. Super. 2016).

Plaintiffs assert that the trial court erred in allowing Defendants to raise counterclaims because Defendants lacked standing to do so. Brief for Plaintiffs at 16-18. Specifically, Plaintiffs argue that any claim arising from a breach of the Lease belonged to Majestic, the sole tenant under the Lease. *Id.* Since the trial court found that Main was the sole owner of Majestic, and thus that Defendants had no ownership interest in Majestic, Defendants were not entitled to bring claims on behalf of Majestic. *Id.*

In the instant case, the underlying rights to legal action resulting from a breach of the Lease, and thus the requisite standing, were inseparable from a determination of the merits, as determination of the merits simultaneously determined whether Defendants had an ownership interest in Majestic that would allow them to bring a derivative action.

In its Opinion, the trial court determined that the claim lacks merit. ***See*** Trial Court Opinion, 10/3/18, at 2-3. Upon review, we agree with the trial court's cogent analysis and affirm on this basis as to Plaintiffs' sole issue on appeal. ***Id.***

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/14/19

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CIVIL DIVISION

MAIN STREET MANSION, LLC and      :      No. 2017-01261-40
MAJESTIC MANSION, LLC          :

                        :      2253 EDA 2018
      v.                 :      2185 EDA 2018
                        :      2875 EDA 2017
KRISTIAN R. TOMASULO and    :
JOSEPH GRANDE, JR.          :

Case # 2017-01261-0135   12075337
Main (Public)
Code: 5214     Judge: 40
Rcpt Z2060613  10/4/2018 12:51:56 PM

## OPINION

### I. PROCEDURAL HISTORY

Main Street Mansion, LLC ("Main Street") and Majestic Mansion, LLC ("Majestic") (or collectively, "Plaintiffs"), commenced this action through their Complaint against Kristian R. Tomasulo and Joseph Grande, Jr. ("Defendants") on February 28, 2017. Defendants filed their Answer and Counterclaim on April 7, 2017. The matter proceeded to a five (5) day non-jury trial before this Court ending November 15, 2017. On April 13, 2018, this Court issued its verdict and written decision in favor of Plaintiffs and against Defendants on all claims and counterclaims.

Pursuant to this verdict, the Court issued an order of ejectment, and awarded damages based on Defendants' guaranty of the contractual rent, late fees, interest, and unpaid real estate taxes. In accordance with the contractual language, the Court further credited Defendants for fit-outs and Key Money improvements, and additional repairs to the property. Thereafter, Defendant filed a number of post-trial motions, which this Court denied on May 25, 2018 as being fully answered by the comprehensive Decision and Order of April 13, 2018.

Defendants filed a Notice of Appeal to the Superior Court on July 19, 2018. Defendants filed their Concise Statement of Errors on August 14, 2018. Plaintiffs filed a Notice of Cross-Appeal on July 25, 2018, and a Concise Statement of Errors on August 15, 2018. Pursuant to Pennsylvania Rule

of Appellate Procedure 1925(a), the Court now files this Opinion in the above-captioned matter in support of the Court's ruling.

## II. MATTERS COMPLAINED OF ON APPEAL

This Court fully incorporates its original thirty-one (31) page Decision and Order dated April 13, 2018 attached hereto as an Appendix. All material matters raised by Defendants in their Concise Statement concern issues raised previously and which were addressed and disposed of by this Court in its Opinion.

Plaintiffs in their cross-appeal raise the only matter not directly addressed in the Opinion of April 13, 2018. Plaintiffs seek a ruling that Defendants lacked standing to raise their counterclaims, and so should not have obtained a ruling on the merits. Plaintiffs' objection as to standing derives from Main Street's claim to ownership of Majestic. That ownership claim was in turn based on the Pledge Agreement and Defendants' default of its terms through the nonpayment of rent. The standing argument against the counterclaims thus rises and falls with Main Street's, and hence Majestic's, affirmative case.

If the Defendants, instead, were correct that their nonpayment was excused by Plaintiffs' own breach, then no default occurred under the Pledge Agreement, and Defendants are the owners of Majestic and therefore have standing.

Plaintiff's argument, if accepted, requires Defendants to first prevail on the merits in Plaintiffs' suit in order to recover control of Majestic before filing for relief on the basis of the counterclaims. The same transaction or occurrence would then require a second round of litigation, in contravention of the purposes of the joinder rules set forth at Pa.R.C.P. 1020. This Court properly considered the

2

counterclaims in this litigation because Main Street's claim to ownership of Majestic in Plaintiffs'
lawsuit cannot be separated from the transaction or occurrence giving rise to the counterclaims.

For the foregoing reasons, this Court respectfully suggests that its Order below be affirmed.

## ORDER

AND NOW, this 13th day of April, 2018, based on the facts and reasons as set forth above,
it is hereby ORDERED and DECREED:

1. Judgment is entered in favor of Plaintiff(s) and against Defendants Kristian R. Tomasulo
   and Joseph Grande, Jr. and Occupants for immediate possession of the Property located
   at 9 S. Main Street, New Hope, Pennsylvania 18938.

2. Verdict is entered in favor of Plaintiff(s) and against Defendants in the amount of Two
   Hundred Forty-Nine Thousand One Hundred Fifteen Dollars and Eighty-Nine Cents
   ($249,115.89) plus reasonable attorneys' fees and costs as may subsequently be determined
   due and owing.

3. Verdict is entered in favor of Plaintiff(s) and against Defendants on all Counterclaims.

BY THE COURT:

_____
JEFFREY G. TRAUGER, JUDGE

N.B.    It is your responsibility
to notify all interested parties
of the above action.

Date:  October 3, 2018

3

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CIVIL DIVISION

MAIN STREET MANSION, LLC and     :
MAJESTIC MANSION, LLC     :
    :
v.     :      No. 2017-01261-40
    :
KRISTIAN R. TOMASULO and     :
JOSEPH GRANDE, JR.     :

Case #: 2017-01261-0078    11878433
Main (Public)
Code: 774    Judge:40
Rcpt Z1971109   4/13/2018 2:28:25 PM

## DECISION AND ORDER

### I. PROCEDURAL HISTORY

Main Street Mansion, LLC ("Main Street") and Majestic Mansion, LLC ("Majestic") (or collectively, "Plaintiffs"), commenced this action through its Complaint seeking ejectment and damages against Kristian R. Tomasulo and Joseph Grande, Jr. ("Defendants"). The Complaint sets forth the following actions: Count I – Ejectment; Count II – Trespass; and Count III - Breach of Guaranty. On April 7, 2017, Defendants filed an Answer, New Matter, and Counterclaim. Defendants' Counterclaims are as follows: Count I - Breach of Contract; Count II - Breach of Implied Covenant of Quiet Enjoyment/Constructive Eviction; and Count III - Fraud.

Plaintiffs' Motion for Judgment on the Pleadings was denied by this Court on June 7, 2017. On June 19, 2017, Defendants filed an Emergency Petition for Preliminary Injunction. The Petition alleged Plaintiffs acted to harm Defendants' ongoing business by wrongfully converting Hotel Liquor License Number 59762 ("Liquor License") to safekeeping with Pennsylvania Liquor Control Board ("PLCB"). A hearing on the injunction request was held June 23, 2017. This Court entered an Order on August 10, 2017 denying Defendants' Preliminary Injunction, which Defendants thereafter appealed on August 28, 2017. Said Appeal is currently pending before Superior Court under Docket

No. 2875 EDA 2017. The Court issued its October 27, 2017 Opinion in support of the ruling denying Defendants' request for a Preliminary Injunction.

On September 22, 2017, September 29, 2017, October 27, 2017, November 13, 2017, and November 15, 2017, a five (5) day non-jury trial was held before the undersigned on Plaintiffs' Claims and Defendants' Counterclaims. At the conclusion of Defendants' case in chief, the Court dismissed all claims based on fraud as alleged in Count III of the Counterclaim. At the conclusion of the trial, Plaintiffs' claims and Defendants' remaining counterclaims were taken under advisement. The parties were directed to submit proposed findings of facts and conclusions of law.

## II. FACTUAL HISTORY

This action arises from a lease transaction for a commercial property located at 9 S. Main Street, New Hope Borough, Bucks County, Pennsylvania ("Property"), being Bucks County Tax Map Parcel 27-010-046, as more fully described in the legal description set forth in the Deed recorded in Bucks County Land Records at Deed Book 5737, page 2202 (See Pls.' Compl. at ¶ 5). The Property consists of a three (3) story and hotel building and restaurant ("The Mansion Inn"), a detached duplex dwelling ("Carriage House") and a parking lot (N.T. 11/13/17, pp. 5-7). The Mansion Inn's first floor includes a parlor, lounge (including a bed), bar area, dining room and kitchen (N.T. 11/13/17, pp. 17-19; See Defs.' Ex. 30). The second and third floors each consist of a common hallway and landing with four (4) bedrooms and two (2) doors on each side of the hallway which provide separate access to those bedrooms (N.T. 11/13/17, pp. 14-18). The Carriage House is a separate two (2) story duplex dwelling and each floor contains a separate unit (N.T. 11/13/17, pp. 6-7, 82). Majestic, a limited liability company, owns the Liquor License approved by PLCB for use at the Property (Pls.' Ex. 1).

2

In March 2016, the Property was vacant and available for rent or sale (N.T. 9/22/17, p. 213). Following several months of negotiations between the parties and their legal counsel, Plaintiff Main Street as landlord and Majestic as tenant executed a thirty-one (31) page lease agreement ("Lease") for the commercial use of the Property on August 12, 2016 (Pls.' Ex. 2). The Commercial Lease included a Lease Guaranty Rider ("Guaranty"). Id. Under the terms of the Lease, Defendants are personally the guarantors to the obligations under the Lease, including the obligation to pay the agreed monthly rent of Twelve Thousand Five Hundred Dollars ($12,500.00) (Pls.' Ex. 4; See Pls.' Ex. 2). Defendants personally guaranteed the Lease for only the first three (3) years of the five (5) year term (Pls.' Ex. 2; N.T. 9/22/17, pp. 29. 57). Prior to the 2016 negotiations and transaction, Defendant Tomasulo had extensively researched the Property and its uses as a restaurant and hotel. Tomasulo had previously visited the Property in 2014 with a business broker and also inspected it a second time in January 2015 with a representative of Main Street (N.T. 9/22/17, p. 210; N.T. 10/27/17, pp. 31, 32).

Contemporaneously with the execution of the Lease in 2016, Defendants individually executed a Pledge Agreement ("Pledge Agreement") under which they pledged One Hundred Percent (100%) of their interests in Majestic and its ownership of the Liquor License to Main Street to secure and guarantee payment obligations under the Lease for a three (3) year period beginning August 12, 2016 (See Pls.' Ex. 3; Pls. Ex. 4; N.T. 9/22/17, p. 31). Majestic's primary asset was the Liquor License which was used in conjunction with the Property (See Pls.' Compl at ¶ 10, 11). Defendants purchased the LLC ownership interests in Majestic, pursuant to the terms of a written agreement ("Membership Agreement") executed with the transactional documents (N.T. 6/23/17, p. 13).

The evidence presented at trial established that prior to signing the Commercial Lease, Main Street granted Defendants full and complete access to the Property on multiple occasions to engage in due diligence and/or inspection(s) of the Property (N.T. 10/27/17, pp. 154-162; N.T. 6/23/17, p.

3

42). Professional inspectors and contractors were independently hired by Defendants and a comprehensive inspection of the Property was conducted on June 9, 2016. Id. As a result of the inspection and sixty-nine (69) page report issued by National Property Inspections, Defendants prepared a proposed repair and rent credit punch list ("Punch List") on June 13, 2016 and sent it to Main Street during the parties' negotiations (See Pls.' Ex. 20; N.T. 10/27/17, pp. 145 -146, 155; N.T. 11/15/17, pp. 214 -215). The record further demonstrates that Defendants and their representatives were permitted unlimited access to the Property beginning mid-July 2017 with Main Street's consent as Defendants began making various repairs and commenced the fit-out process of The Mansion Inn interior bar and other public areas (N.T. 9/22/17, pp. 212, 213; N.T. 9/29/17, pp. 35-37; N.T. 10/27/17, pp. 157-159).

As of July 15, 2016, Defendants effectively took physical possession of the Property (See Pls.' Ex. 2; N.T. 9/22/17, pp. 51-53). The Lease initially (before Defendants amended the Lease with their Final List) provided Defendants with the opportunity to carve out certain Landlord "repair items" (N.T. 11/13/17, p. 116). After commencing the fit-out work at the Property in preparation for their business opening, Defendants generated additional requests for credits and repairs which included the front and back deck, a first floor bathroom, a second floor bathroom, ceiling and plumbing repairs, and a supplemental repair and credit request which was sent to Main Street on July 27, 2016 (See Pls.' Ex. 11, Ex. 29; N.T. 10/27/17, pp. 36-38, 154-162). Defendants also submitted, by and through their attorney, Brian Keyes, Esquire, a finalized repair and credit list, which was subsequently titled "Landlord Repair Items For Which Tenant Has Assumed Responsibility." This document became Exhibit "B" attached to the Lease (Pls.' Ex. 2, Exhibit B). With the exception of the items included in Exhibit "B," the Lease indicated that Defendants leased the Property in "as-is" condition (Pls.' Ex. 2, pp. 1, 7; N.T. 11/13/17, p. 116).

4

On August 12, 2016, the parties executed a thirty-one (31) page Commercial Lease and exchanged all related commercial transactional documents (See Pls.' Ex. 2; N.T. 9/22/17, pp. 51-52). The Lease documents contain a merger and integration clause that warrants there were no oral agreements between the parties and the final executed transactional documents superseded any prior negotiations or oral understandings. At the time the Lease was signed on August 12, 2016, Defendants had been making repairs and performing tenant fit-out to prepare the Property for their business operations since mid-July 2016 (N.T. 11/15/17, pp. 172-175). Defendants' business plan and fit-out process included new restaurant facilities at The Mansion Inn including separate improvements not part of the negotiated rent credit (N.T. 11/15/17, p. 174). Under the terms of the August 2016 Commercial Lease, Defendants were provided the agreed-upon rent credits at Twelve Thousand Five Hundred ($12,500.00) monthly from July 15, 2016 through October 1, 2016 in exchange for performing the work agreed upon by the parties including: cleaning the swimming pool and making it operational; repairing the porch, back door, and left side of the house; removing mold from the basement; cleaning various kitchen equipment; cleaning gutters; repairing the dining and front room ceilings; repairing the front wall; repairing the front patio decking and front door; repairing the first floor bathroom; repairing the second floor bathroom; performing certain plumbing work; repairing identified termite damage; and exterminating any live termite infestation (N.T. 11/15/17, pp. 172-175; Pls.' Ex. 2).

The Lease also set forth a separate provision requiring Defendants to deposit the sum of One Hundred Fifty Thousand Dollars ($150,000.00) called "Key Money," in an escrow fund to ensure improvements, credits, reductions, investments or recapture for capital investment. Id. Effective as of the signing of the Lease in August 2016, Defendants were credited Thirty-Six Thousand Six Hundred Eighty-One Dollars ($36,681.00) against the One Hundred Fifty Thousand Dollars ($150,000.00) for repairs they had completed under this separate contractual provision (N.T. 9/22/17,

5

pp. 50, 109, 157, 207). The Lease terms also required Defendants to deposit the post-credit balance of Key Money in the sum of One Hundred Thirteen Thousand Three Hundred Nineteen Dollars ($113,319.00) into an escrow fund to be expended, as agreed by the parties, for limited purposes identified as: 1) capital improvements as defined in the Lease; 2) furniture, fixture and equipment; 3) carpentry and flooring; and 4) exterior work and landscaping (Pls.' Ex. 2; N.T. 9/22/17, pp. 50-51; N.T. 10/27/17, p. 172; N.T. 11/15/17, p. 94).

Prior to the opening of the business, a use and occupancy ("U&O") inspection was scheduled with New Hope Borough officials for October 6, 2016 (Pls.' Ex. 9; N.T. 9/14/17, pp. 14-15). The Property was inspected as scheduled by Jesse Hill ("Building Inspector") and Kevin Doherty ("Fire Marshall") (N.T. 9/14/17, pp. 14-15; N.T. 9/22/17, pp. 162-163, 182). The Building Inspector issued a U&O permit for the first floor of The Mansion Inn consisting primarily of the restaurant and bar areas and issued a punch list for items that remained to be completed on the second and third floors (Pls.' Ex. 10; N.T. 9/14/17, pp. 15-16, 21-28; N.T. 9/22/17, p. 163). The Building Inspector's punch list included: replacing two (2) smoke/ $CO_2$ detectors; replacing fixtures for two (2) bathrooms, one (1) on the second floor and one (1) on the third floor; and installing missing lightbulbs on the third floor (Pls.' Ex. 10; N.T. 9/14/17, pp. 15-19, 26-27). The Building Inspector anticipated issuing a final U&O permit upon completion of the minor punch list items for the second and third floors within days of October 6, 2016 (N.T. 9/14/17, pp. 27-28). The record before the Court indicated the Fire Marshall had observed The Mansion Inn hotel rooms and bathrooms were apparently already being utilized at the time of the inspection (N.T. 9/22/17, pp. 184-188).

Defendants began operating the restaurant, serving alcohol and renting rooms on the second and third floors to the public in October 2016 prior to obtaining the Borough's final approval in March 2017 (N.T. 11/13/17, pp. 16-19; N.T. 11/15/17, pp. 142-143). Defendants did not apply for

6

any plumbing or other permits for additional work on the second or third floors after the initial U&O inspection on October 6, 2016 (N.T. 9/22/17, p. 173). Following the commencement of this legal action, Defendants contacted Borough officials and scheduled a re-inspection of the Property for March 28, 2017 after which the Borough finally approved the second and third floors for hotel guest occupancy (N.T. 9/22/17, pp. 163, 169; N.T. 11/13/17, pp. 24-26).

On September 26, 2016, PLCB had inspected and approved the Property for the use of the hotel Liquor License (N.T. 11/13/17, p. 18). However, neither Majestic nor Defendants notified PLCB of any change in the corporate officer or management structure of Majestic following the signing of the Lease, and neither party took any steps thereafter to ensure the Liquor License remained valid and current (N.T. 9/29/17, p. 211). The License was later deemed by PLCB to have expired on November 30, 2016 (N.T. 9/29/17, pp. 259-260).

During trial, Main Street's contractor, McGowan Builders ("McGowan Builders"), demonstrated through a color-coded roof plan dated October 18, 2016 ("Roof Plan") that The Mansion Inn has different types of roofs with different levels and each roof section functioned independently (Defs.' Ex. 40; N.T. 11/15/17, pp. 251-254). The Roof Plan shows seven (7) different roof sections, numbered 1 through 7 (See Defs.' Ex. 40; N.T. 11/15/17, pp. 255-257). The evidence presented to this Court clearly established that no indication of any roof leaks were detected and no roof repairs were determined necessary when the Property was professionally inspected on June 9, 2016 (See Pls.' Ex. 19; N.T. 10/27/17, p. 138). On July 27, 2016, Defendants initially discovered two (2) leaks in The Mansion Inn, both on the single part of the first floor, one above a back door and one in the first floor lounge area, both being below single-story Roof Three (3) on the Roof Plan (Pls.' Ex. 29; N.T. 11/15/17, p. 255). On or about September 30, 2016, Defendants reported to Main Street a "massive emergency" related to a second roof leak (See Defs.' Ex. 6; N.T. 9/22/17, pp. 70-71, 152;

7

N.T. 9/29/17, pp. 109-111; N.T. 11/13/17, pp. 150, 262). McGowan Builders responded to the tenants' report by examining the Property and the roofs and performing repairs (N.T. 11/13/17, p. 83). McGowan Builders kept records of the various roof repair work performed such as a flood spray test, replacing sub-roofing, capping the chimney, installing a membrane roof, performing moisture tests and tarring roof sections as applicable to address the roof leak(s) (See Pls.' Ex. 28, Ex. 32, Ex. 40; N.T. 11/15/17, pp. 255-258, 266-270).

Defendants met with Main Street representatives in early November 2016 to inspect The Mansion Inn as completed and discuss their claims for additional rent credits. While Defendants paid the November 2016 Lease payment due and continued to operate their business at the Property, Defendants did not pay any monthly Lease rents due for December 2016, January 2017, and February 2017 and all months thereafter, all of which constituted an event of default under the Commercial Lease (See Pls.' Ex. 5). A written Notice of Default was issued to Defendants on January 13, 2017 setting forth the events of defaults under the Lease and under the Pledge Agreement including: failure to pay rent; failure to pay utility bills; failure to pay real estate tax bills; failure to meet required PLCB certifications; failure to submit proof of required payment of sales and use taxes; failure to provide required accounting information according to Generally Accepted Accounting Principles ("GAAP"); failure to establish a required escrow account in the amount of One Thousand Thirteen Three Hundred Nineteen Dollars ($113,319.00); and failure to complete the required agreed-upon work on The Mansion Inn including the overhang on the left front side of the house, the back door and the retaining wall. (N.T. 9/22/17, pp. 29-30, 59-60; See Pls.' Ex. 5, Ex. 2, Ex. 30).

Plaintiffs issued a subsequent notice dated February 27, 2017 advising Defendants Main Street was exercising its right as attorney in fact under the Pledge Agreement to transfer the pledged collateral under the Agreement consisting of the ownership interests in Majestic (and its Liquor License for the

8

Property) back to Plaintiff Main Street (See Pls.' Ex. 4). Thereafter, Main Street exercised its rights under the Pledge Agreement and the Liquor License was placed in safekeeping with PLCB on June 8, 2017 (N.T. 9/22/17, p. 31). During the time between the PLCB inspection of September 26, 2016 until the Borough's approval of the U&O for the second and third floors on March 29, 2017, The Mansion Inn was not compliant as a bona fide hotel (See Defs.' Ex. 21; N.T. 9/29/17, p. 259). Pennsylvania State Police investigated and issued the results of their investigation in an August 2017 incident report citing three (3) specific claims: 1) not a bona fide hotel where the public may stay; 2) sold liquor and/or malt beverages after the Liquor License expired on November 30, 2016 and had not renewed and/or validated; and 3) failed to notify PLCB within fifteen (15) days of a change of officers, directors and/or stockholders (See Defs.' Ex. 21; N.T. 9/29/17, pp. 259- 260).

As a result of the default under the Lease, Main Street and Majestic (as a tenant out of possession) filed this action against Defendants to regain possession of the Property and to recover monetary damages including unpaid rent, unpaid real estate taxes for 2016 and 2017, late fees, interest, counsel fees, and other damages from December 1, 2016 to present. Main Street additionally demands recovery of counsel fees as authorized under the Commercial Lease. In its Proposed Findings of Fact and Conclusions of Law filed with the Court on February 16, 2018, Main Street provided the Court with an updated and itemized calculation of accelerated lease damages and requested the entry of a monetary judgment in the sum of Seven Hundred Nine Thousand Two Hundred Three Dollars and Fifty Cents ($709,203.50).

Defendants claim they properly withheld rent payments as a result of Main Street's failure to make necessary repairs. In April 2017, Defendants filed their Answer and Counterclaims alleging Main Street breached the Lease by: failing to make necessary repairs to the Property including roof repairs; fraudulently or negligently misrepresenting it had "marketable title" to the Liquor License; and

9

not fully conveying the Liquor License to Defendants. Defendants argue they lawfully withheld rent due under the Lease as a result of Main Street's failure to cure continuing breaches under the Lease, thereby forcing Defendants to undertake essential repairs to preserve their business operations at the Property. Defendants request the entry of judgment in their favor and against Main Street for various alleged damages including monetary damages for the monies spent on performing necessary repairs together with lost profits due to defects in the Property and loss of the Liquor License. Defendants also demand punitive damages, interests, attorney's fees and costs. After reviewing the record and examining all evidence presented, the Court now issues this written Decision and Order.

### III. DISCUSSION

#### a. Fraud Claims

In their Counterclaim filed against Plaintiffs, Defendants claim the Lease was the product of fraud, was induced by false representations, essential lease terms not stated in the Lease were implied, and Plaintiffs' default under the Lease resulted in their constructive eviction (See Defs.' Answer, New Matter & Countercl., p. 11). After examining the record and weighing and assessing the credibility of all testimony and evidence presented, the Court finds that the Lease was not the product of fraud due to the various actions which proceeded the execution of the Lease. The parties are sophisticated businesspersons who did not reasonably rely on any oral representations related to this commercial transaction. Defendants' testimony at trial confirmed they had spent considerable time reviewing the market for available commercial properties, developing a detailed business plan, and personally and professionally inspecting this specific property known as The Mansion Inn.

Both parties in this matter are clearly experienced businesspersons who were independently represented by legal counsel. Legal counsel assisted in the negotiation and documentation of all terms of this commercial transaction. Defendants further had access to the advice of legal counsel regarding all potential post-dispute contractual remedies as may be contained in the commercial documents as

10

well as all legal remedies otherwise available under Pennsylvania law. Defendant Tomasulo testified all terms of the commercial transactional documents were negotiated and reviewed by legal counsel (N.T. 6/23/17, pp. 50, 55, 63). Defendant Tomasulo acknowledged being an experienced businessperson and that during his career on Wall Street he personally managed client funds worth approximately half-a-billion dollars (N.T. 6/23/17, pp. 4, 40).

The record clearly evidences Defendants were given every opportunity to personally and professionally inspect the Property prior to the signing of the Lease. Tomasulo testified he was familiar with the Property and its uses as a restaurant and hotel and had examined the Property initially in 2014 with a business broker:

> BY MR. GOULD:
> Q. Okay. Now, let's go back a little bit to the initiation of the process entering into this agreement with the plaintiff. How did you come to approach them?
> A. I actually saw the property about a year-and-a-half prior to seeing it in I guess it was the beginning of 2016. So I looked at it. I believe it was the beginning of the fall of 2014 prior to them entering the agreement with Sammy Stanelli.
> Q. And Sammy Stanelli is the person I referred to as the Staten Island group?
> A. That's correct.

(N.T. 9/22/17, p. 210).

Tomasulo later visited the Property in 2015 as well as 2016:

> BY MR. GOULD:
> THE COURT. Is that the first time that you had access to the interior of the property?
> THE WITNESS. Besides the -- I mean, I've done a couple walk-throughs with Sean Holmes prior. One was --
> THE COURT. Okay. Let's -- hold on. Let's do this. The very first time you went into the interior of the building, describe what you did, the walk-through, second time, third time, inspector. I want to know how many times -- go ahead.
> A. I actually saw the property about a year-and-a-half prior to seeing it in I guess it was the beginning of 2016. So I looked at it. I believe it was the beginning of the fall of 2014 prior to them entering the agreement with Sammy Stanelli.

11

> THE WITNESS. January 2015 was the first time I viewed the building. I had Valerie Hegarty there. Did a 20-minute walk-through.
>
> THE COURT. What did you look at?
>
> THE WITNESS: I looked at the interior, the exterior kitchen mostly. You know, kind of a full, very superficial walk-through.
>
> THE COURT. And the inn wasn't operating at that time?
>
> THE WITNESS. Correct.

(N.T. 10/27/17, pp. 30-31).

Tomasulo and Grande hired a professional inspector and contractors and engaged in further due diligence to assess the Property (N.T. 10/27/17, pp. 22-24). The record reflects Defendants' professional inspections were completed on or around June 9, 2016 and included: a comprehensive property inspection completed by National Property Inspections; a comprehensive written inspection of the existing swimming pool completed by Raines Pool Service; and a comprehensive inspection of the exterior of the Property completed by a landscape contractor, Fox Landscaping (Pls.' Ex. 19; N.T. 10/27/17, pp. 154-155; N.T. 10/27/17, pp. 134, 137; N.T. 9/22/17, p. 230). Following the completion of the inspections, Defendants submitted to Main Street a written proposed repair and credit list with proposed rent credits (Pls.' Ex. 20). After submission of the list, Main Street continued to allow Defendants access to the Property while negotiations continued between the parties and through their attorneys (N.T. 10/27/17, pp. 153-155).

The Court also notes that each transactional document, signed by the parties following the advice of their respective legal counsel, contains a merger and integration clause. Defendants attempted at trial to introduce oral and/or implied terms to supplement the transactional documents. The Court did not consider nor accept any evidence in violation of the parol evidence rule. "Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any oral or written negotiations of agreements involving the same subject matter as the contract is almost always inadmissible." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004).

12

Absent fraud or unconscionability, courts should not set aside contractual terms on which sophisticated parties agreed. *See* Vasillis v. Bell of Pa., 598 A.2d 52, 54 (Pa. Super. 1991). The record before the Court is wholly devoid of any evidence of fraud or unconscionable contract terms.

Rather, the Court finds the instant Lease to be a fully integrated contract between sophisticated business parties. The Court therefore properly entered a non-suit on the "fraud" count of Defendants' Counterclaim at the conclusion of individual Defendants' case in chief. The Court holds Defendants contractually obligated to the terms of the written documents which they negotiated and signed in this commercial transaction.

### b. Constructive Eviction and Covenant of Quiet Enjoyment Claims

Defendants contend Main Street is the party which initially and substantively breached the Lease due to its: failure to take reasonable action to ensure the Property was in usable condition prior to leasing it; failure to keep the Property in good repair; failure to conduct all necessary repairs including fixing the roof; and failure to disclose the non-compliant status of the Liquor License. During the trial, Defendants' counsel argued to this Court that constructive eviction is a subset of the implied covenant of quiet enjoyment doctrine, and therefore, based on their allegations of Main Street's breach, Defendants were constructively evicted from the Property entitling them to withhold rent under Pennsylvania law (N.T. 10/27/17, pp. 88, 89; N.T. 11/15/17, pp. 227- 229):

Based on the factual record in this case, the Court finds Defendants' arguments unavailing and rejects the contention they were constructively evicted. Under the law of this Commonwealth, the landlord's interference with a tenant's enjoyment of the premises must be of a substantial nature to constitute constructive eviction:

> To constitute a constructive eviction, the interference by a landlord with the possession of his tenant or with the tenant's enjoyment of the demised premises must be of a *substantial nature and so injurious to the tenant as to deprive him of the beneficial*

13

> *enjoyment of a part or the whole of the demised premises, ... to which the* *tenant yields, abandoning the possession within a reasonable time.* But, [h]owever much the tenant may be disturbed in the beneficial enjoyment of the premises by the landlord's wrongful act, there is no constructive eviction if he continues in possession of the whole of the premises. Possession must be given up by the tenant in consequence of the landlord's acts.

Kuriger v. Cramer, 498 A.2d 1331, 1338 (Pa. Super. 1985)(emphasis added).

In order for a tenant to establish constructive eviction, the tenant must abandon the premises. Chelten Ave. Bldg. v. Mayer, 172 A. 675, 677 (Pa. 1934). One of the few undisputed facts in this matter is that Defendants never surrendered possession of the Property. Rather, Defendants continue to occupy the Property and operate their business from The Mansion Inn, a fact which was confirmed by the testimony of Defendant Tomasulo:

> THE COURT. So the restaurant began - the restaurant began operation when?
> THE WITNESS. Second week in October.
> THE COURT. And it continued to operate the whole time?
> THE WITNESS. That's correct.
> THE COURT. And how many -- how many people can you seat in the restaurant?
> THE WITNESS. Approximately 54 inside and another 18 outside, and probably another ten to 12 at the bar.

(N.T. 9/29/17, p. 117).

Further evidence confirmed Defendants used and continue to use the Property throughout as a bed and breakfast and Defendants received monies for this use from members of the public (N.T. 11/13/17, pp. 28-29). The record before this Court further established Defendants, unlike prior commercial occupants, elected not to rent the Carriage House as part of the restaurant and hotel. (NT. 11/13/17, pp. 5-6). Rather, Defendants Tomasulo and Grande both chose to personally reside in and occupy the Carriage House (NT. 11/13/17, pp. 5-7). Further contradiction is evident as Defendants assert they are justified in not paying rent because they were "constructively evicted due to the business's building" being in bad repair and such fact injured their business and ability to pay rent, yet

14

they never ceased business operations and did not vacate the main building or the Carriage House at any point following the execution of the August 2016 Lease (See Defs.' Answer, New Matter & Countercl., p. 11). Defendants, throughout this litigation, remained in possession of the Property and continued to operate the restaurant as BYOB and a hotel despite their admission of failing to make the contractual monthly Lease payments due following their tender of the November 2016 Lease payment.

The Court finds based on the record that Defendants failed to present any evidence to support their theory of constructive eviction or otherwise the showing of Plaintiffs' interference in any manner with Defendants' use and enjoyment of the Property. The Court concludes Defendants have unlawfully withheld rent, and therefore, unlawfully remain in possession of the Property while they have continually operated their business throughout these proceedings.

### c. Property Claims

Defendants also allege in their counterclaim entitlement to damages arising from Plaintiffs' failure to conduct necessary repairs to the Property, including "multiple roof leaks." "While commercial tenants may be entitled to a rent rebate where the landlord has failed to provide a space in conformity with lease expectations, the only expectation herein was that the premises would be rented 'as is.' " Ferrick v. Bianchini, 69 A.3d 642, 657 (Pa. Super. 2013). The record supports the Court's finding that Defendants leased The Mansion Inn Property in "as-is" condition. Defendants had unconditional access to the Property since at least May 2016 (N.T 6/23/17, pp. 41, 42). Defendants had the Property professionally inspected on June 9, 2016 by National Property Inspections as part of their due diligence prior to signing the final Lease. The Property's alleged defective conditions, including mold, termite infestation, poor ceilings and inoperable bathrooms, were known to Defendants prior to the effective date of the Lease (Pls.' Ex. 1). As noted previously, both parties were experienced in business and represented throughout by legal counsel. Prior to

15

executing the Final Lease in August 2016, Defendants had the opportunity, with the assistance of their attorney, to carve out certain Landlord "repair items." Defendants submitted a proposed list entitled "Landlord Repair Items For Which Tenant Has Assumed Responsibility" in return for the negotiated rent credits. Once the parties reached this agreement regarding repairs in exchange for rent credits, they effectively rendered the "as-is" Lease provision fully effective without exceptions.

The negotiated terms of the Lease expressly provided that the parties agreed to rent credit from the commencement of the Lease through October 1, 2016 "in lieu of Landlord's repairing items" (Pls.' Ex. 2, Section 1.3; N.T. 9/29/17, p. 40). The Lease also required Defendants to deposit a sum of One Hundred Fifty Thousand Dollars ($150,000.00), called "Key Money," in an escrow fund to ensure improvements, credits, reductions, investments or recapture for capital investment (N.T. 10/27/17, p. 172; N.T. 11/13/17, pp. 54, 57-60). The Lease executed by the parties evidences that Defendants were also separately credited Thirty-Six Thousand Six Hundred Eighty-One Dollars ($36,681.00) against the One Hundred Fifty Thousand Dollars ($150,000.00) Key Money provision for the various property improvements they had made as contemplated by the parties under this paragraph of the Lease (N.T. 9/22/17, pp. 50, 109, 157, 207). The record is clear Defendants failed to deposit the remaining One Hundred Thirteen Thousand Three Hundred Nineteen Dollars ($113,319.00) Key Money into an escrow fund following the execution of all transactional documents by the parties (N.T. 9/22/17, p. 50).

The evidentiary record before this Court supports a conclusion that Defendants performed some repairs which were not agreed upon by the parties, despite the provisions requiring Main Street's consent. For instance, Defendants had proposed in the aforesaid addendum to the Lease to repair the outside bar (Pls.' Ex. 2, Exhibit B). Instead, Defendants completely demolished the outside bar and built a different bar without the consent of Main Street or a permit from the Borough. (N.T. 9/22/17, pp. 107-108). James Kopchak, New Hope Borough building code official, testified:

16

BY MR. WILD:

Q. What's P-13, Mr. Kopchak?

A. P-13 appears to be a legal Stop Work Notice that I posted at the location.

Q. And why did you do that?

A. They constructed and did alterations to an outdoor bar and patio without securing the proper building permits in accordance with PA Act 45.

(N.T. 9/22/17, p. 174). Kopchak also testified on cross:

BY MR. GOULD:

Q. All right, Mr. Kopchak, is the outdoor bar and patio completed?

A. Yes, sir, they completed it without securing the permits.

Q. How would that happen if you issued a Stop Work Order?

A. I issued a Stop Work Order and your clients ignored my Stop Work Order and continued to work.

Q. You don't remember them making applications for the permission?

A. They made application and never paid for the permit application, and it was a long, drawn out process getting them to make the application.

Q. And have you seen the completed outdoor bar and patio?

A. I have seen the completed outdoor bar and patio.

Q. And how does it pass muster?

A. I didn't have a footing inspection, didn't have a rough framing inspection, didn't have the required electrical inspections. So it did not pass muster. It's in violation of Pennsylvania Act 45.

(N.T. 9/22/17, pp. 174-175).

The record further supports a finding that no evidence of roof leaks was present or known to either Main Street or Defendants as of the date the Property was professionally inspected on June 9, 2016 (Pls.' Ex. 19; N.T. 9/22/17, pp. 148-149; N.T. 10/27/17, p. 138). The Building Inspector and the Fire Marshall observed no evidence of flooding or leaking on the second or third floors during the October 6, 2016 Use and Occupancy inspection (See Pls.' Ex. 6; N.T. 9/14/17, pp. 46-47). On September 30, 2016, between the PLCB inspection on Monday September 26, 2016 and the Borough inspection on October 6, 2016, Defendants reported a "massive emergency" to Main Street (See Defs.' Ex. 6; N.T. 9/22/17, pp. 117-119, 122). A representative of McGowan Builders, Main Street's

17

contractor, testified to the multiple occasions work was performed on the Property and the roofs (N.T. 11/15/17, pp. 254-270). McGowan kept records of all repair work done including repairs to the Property's roofs (See Pls.' Ex. 28; N.T. 11/15/17, pp. 264-270). McGowan further evaluated possible subsequent roof repairs to an area identified as the first floor lounge roof on March 13, 2017 and confirmed the roof was not leaking but made interior repairs on March 24, 2017 to correct improper construction previously performed by or on behalf of Defendants (N.T. 11/15/17, pp. 259-261).

At trial, Defendants were unable to produce corresponding receipts, estimates, invoices, payment records or verified documents to confirm any repair work performed by them or their contractors between September 30, 2016 and October 6, 2016. Defendants only presented testimony from their contractor Frank Martines ("Martines") (N.T. 11/13/17, p. 213). Martines testified he was not able to recall specific dates of work performed or any amounts paid for any specific work performed at the Property as he was not good at keeping records (N.T. 11/13/17, pp. 217, 225, 248).

Defendants consistently failed to produce corresponding financial documents or verified documents of any kind to confirm repair work they alleged to have performed. Defendants did not present adequate documentary support to corroborate their testimony. The Court finds Defendants clearly had ample access and opportunity to fully inspect all aspects of the Property prior to signing the Lease. Defendants had the Property professionally inspected, and based on the sixty-nine (69) page written report produced, were fully aware of the Property's condition. Prior to signing the Lease, Defendants used this knowledge and information to negotiate a rent credit in exchange for their agreement to make the necessary repairs. As previously indicated, Defendants' own testimony established they are sophisticated business people represented by legal counsel throughout in negotiating and preparing the transactional documents ultimately signed by the parties. The Court finds Defendants are not entitled to damages based on their claims against Main Street.

18

### d. Nonpayment of Rent Claims

"[L]eases between landlords and tenants are governed by contract law." Stonehedge Square Ltd. v. Movie Merchants, Inc., 685 A.2d 1019, 1025 (Pa. Super. 1996) (internal citation omitted). A contract is enforceable when the parties reach mutual agreement, exchange consideration and have outlined the terms of their bargain with sufficient clarity. *See* Com. Dept. of Transp. v. First Penna. Bank, 466 A.2d 753 (Pa. Cmwlth. 1983). Parties have the right to make their own contract and it is not the function of the court to rewrite it or give it a construction in conflict with the plain meaning of the language used. *See* Baker v. Commonwealth of Pennsylvania, Department of Transportation, 315 A.2d 669 (Pa. Cmwlth. 1974). Courts must interpret contracts as written, and in construing a contract each and every part of it must be taken into consideration and be given effect; the intention of the parties must be ascertained from the entire instrument. John McShain, Inc. v. General State Authority, 307 A.2d 469, 472 (Pa. Cmwlth 1973).

"To successfully maintain a cause of action for breach of contract a party must establish: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. There is no need to allege any degree of negligence, as negligence is irrelevant to a contract action, unless the alleged breach is based on a contractual duty to provide professional skills consistent with those expected in a given field." *See* Bailey v. Tucker, 621 A.2d 108, 112 (Pa. 1993). A party seeking damages for breach of contract "must be able to prove such damages with reasonable certainty." Wilcox v. Regester, 207 A.2d 817, 822 (Pa. 1965).

Defendants argue that Main Street is the breaching party under the Commercial Lease due to its failure to: take reasonable action to ensure the Property was in usable condition prior to leasing it; keep the Property in good repair; conduct the necessary repairs including fixing the roof; and disclose the non-compliant status of the Liquor License. Defendants further allege that Main Street leased the

19

Property with "hidden defects" which Main Street knew or should have known, and that such defects rendered the Property defective and deprived Defendants of their benefit of the bargain contained in the Lease. Defendants state that based on these allegations they are entitled to withhold all rent payments because Main Street materially deprived them of quiet enjoyment of their leasehold.

The Court finds Defendants' contentions contrary to the facts of this case and Pennsylvania law. "The parties to a lease must be able to rely on the terms for which they bargained in an arms-length transaction." Ross v. Gulf Oil Corp., 522 A.2d 97, 99 (Pa. Super. 1987). All parties of this commercial transaction are sophisticated businesspersons represented by legal counsel in the negotiation and drafting of the agreements at issue before the Court. Defendant Tomasulo testified prior to operating The Mansion Inn he had over twenty (20) years of experience in asset management mostly in the healthcare sector and that he had previously worked as a hedge fund manager (N.T. 9/22/17, p. 191). Defendant Grande had worked in stock trading with Goldman Sachs, Citigroup and Deutschebank as a financial advisor (N.T. 11/15/17, p. 72). Defendants were represented by an attorney, Brian Keyes, Esquire, in negotiating the terms of the transactional documents signed with Main Street and Majestic (N.T. 9/22/17, pp. 234, 235; 10/27/17, pp. 38, 39). All documents were signed not in reliance upon any statements by Main Street but rather after Defendants had the benefit of complete access to the Property over a substantial period of time and the benefit of a professional inspection resulting in a comprehensive written sixty-nine (69) page report addressing all aspects of the Property.

Defendants were sued in their capacity as guarantors of the Lease. The record clearly establishes that Defendants, as guarantors under the Lease, are obligated for monthly rent payments (See Pls.' Ex. 2). The record fully supports the Court's finding that Defendants defaulted under the Lease after failing to tender monthly lease payments due for December 2016 and the months thereafter (See N.T. 6/23/17, pp. 36, 37). The testimony before this Court also proves Defendants never funded

20

the independent escrow fund as required under the Lease (N.T. 9/22/17, p. 218). Despite completing an independent professional inspection of the Property and indicating on the June 13, 2016 punch list that the swimming pool was "operational, cleaned, and running," Defendants neglected to maintain the swimming pool, and it substantially deteriorated and was never subsequently made operational (Pls.' Ex. 20; N.T. 10/27/17, pp. 145-146; N.T. 9/22/17, pp. 106-107). Defendant Tomasulo testified:

> THE COURT. So let me just go down the list. You could just say yes or no. Did you do the cleaning of the swimming pool and making it operational?
> THE WITNESS. No.
> THE COURT. And your reason is because you didn't believe you could do that?
> THE WITNESS. We had an estimate, and it was over $10,000 to —
> THE COURT. Okay. How about door handle installed --

(N.T. 9/22/17, p. 223-224).

Section 2.3 of the Lease also requires "[t]enant shall be responsible for the full amount of real property taxes and all special assessments and governmental charges of very character imposed on the Premises..." (Pls.' Ex. 2, p. 3). Consequently, Defendants, as guarantors of Tenant, are responsible for payment of the Property's real estate taxes. The testimony and evidence presented to this Court established conclusively that Defendants did not pay the real estate taxes and that a tax lien filing was placed against the Property due to Defendants' failure to pay real estate taxes due (Pls.' Ex. 15; N.T. 9/14/17, p. 8; N.T. 9/22/17, pp. 43-45; N.T. 11/15/17, p. 166).

Kristian Tomasulo testified that Defendants have continuously operated The Mansion Inn since Fall 2016. The business consists of a restaurant, overnight accommodations and a bar under Hotel Liquor License Number 59762. He testified he and Joseph Grande, Jr. purchased the License through the vehicle of the Membership Agreement (N.T. 6/23/17, pp. 14, 15). Tomasulo further testified that around February 2017, a PLCB inspector conducted a routine audit after it was

21

determined that the ownership/transfer of the License was in question (N.T. 6/23/17, pp. 20, 21). The PLCB inspector noted Valerie Hegarty was still named president of Majestic Mansion, not Defendants (N.T. 6/23/17, p. 21). Tomasulo's testimony further confirmed Defendants were contractually required to diligently pursue all necessary PLCB applications and changes necessary as part of the transaction and yet had not done so despite being represented by legal counsel during all negotiations, preparation of the transactional documents and these litigation proceedings (N.T. 6/23/17, pp. 48, 49).

"Ejectment is the proper action for the recovery of possession of [property]." Irwin v. Hoffman, 179 A. 41, 45 (Pa. 1935). Ejectment is an action filed by a plaintiff who does not possess the land but has the right to possess it, against a defendant who has actual possession. *See* Soffer v. Beech, 409 A.2d 337 (Pa. 2002). Plaintiffs have provided compelling evidence regarding Defendants' Lease defaults, and as a consequence, Plaintiffs' entitlement to possess the Property. The Court accordingly finds Plaintiffs are entitled to immediate possession of the Property. Defendants have no right to continue to occupy the Property under the terms of the written transactional documents agreed between the parties, as they have only made the November 2016 monthly lease payment.

This Court concludes Defendants breached their payment obligations by failing to make required agreed-upon monthly payments due under the Lease. The Court finds that Plaintiff Main Street is entitled to the unpaid contractual lease payments since December 2016 until the current month of April 2018, totaling Two Hundred Thirty-Six Thousand Four Hundred Twenty Dollars and Fifty-One Cents ($236,420.51). Main Street is further entitled to the unpaid real estate taxes totaling Nineteen Thousand Eight Hundred Twelve Dollars and One Cent ($19,812.01).[1]

---

[1] The Court incorporates the calculations of unpaid rent and unpaid real estate taxes as included in Appendix "A" to Plaintiffs' Proposed Findings of Fact Brief filed on February 16, 2018.

### e. Fairness and Due Process Claims

Throughout these proceedings, Defendants' counsel baselessly argued that this Court's ruling resulted in a deprivation of Defendants' "due process" (N.T. 9/14/17, pp. 73-74). Defendants' counsel alleged his clients were denied discovery by the Court. "The Court's *sua sponte* prosecution of expedited proceedings without consideration for Defendants' litigation preparation needs and their solo practitioner counsel's time and resources prejudicially affected their case" (Defs.' Proposed Findings of Fact ("FOF"), p. 2). Initially, the Court does not and will not enter rulings based upon whether the parties to an action are represented by a solo practioner, a small law firm or a large law firm. All parties are free to retain counsel of their choice and all counsel are free to determine whether they do or do not have the resources and expertise to handle a specific case before accepting a client's matter for representation.

The record is clear that both parties were bound by the same discovery schedule. This Court did not have any personal knowledge of or contact with any of the parties prior to this case. It should be further noted that this case is based primarily upon the commercial transactional documents which both parties agreed upon and executed prior to the initiation of this action, and presumably had full and complete copies of since the signing in 2016. On June 23, 2017, this Court held its initial courtroom proceeding with the parties which was a full day hearing on Defendants' Emergency Petition for Preliminary Injunction. Defendant Tomasulo was the only witness to testify at the hearing. Following this evidentiary hearing, all parties were given fair and ample opportunity to present their case, witnesses and all relevant evidence during trial from September 22, 2017 through November 15, 2017. The Court duly considered all parties' claims and testimony presented on the record as well as the post-trial briefs prepared and submitted by counsel. At trial, the examination of Defendant Tomasulo was conducted over a period of two and one-half (2 ½) days. Defendant Tomasulo's testimony was lengthy and exhaustive as the record reflects. The Court heard testimony

23

from Frank Martines, Defendants' contractor, and Joseph Grande. Defendants' counsel clearly had sufficient opportunity to cross and re-cross examine all of Plaintiffs' witnesses and to present any witnesses and documents to support his clients' case, subject to the Pennsylvania Rules of Evidence.

Despite being confusing and contradictory at times, the Court considered all witness testimony presented by the defense, assessed witness credibility and gave all witness testimony and documentary evidence the weight the Court, as the fact-finder, deemed appropriate. During trial, on multiple occasions, Defendants' counsel and co-Defendant Grande were observed whispering and making non-verbal gestures to communicate with the testifying witness. After taking a brief afternoon recess on day four (4) of the trial, Plaintiffs' counsel finally objected on the record to this conduct and in response, Defendants' counsel stated as follows:

> THE COURT. Mr. Gould, your response?
> MR. GOULD. Your Honor -
> THE COURT. Is it true?
> MR. GOULD. No.
> THE COURT. Oh, it's not true.
> MR. GOULD. I was discussing what I was going to ask my client when he was on the stand. And my purpose in doing that is because I am restricted in how I get to ask him questions. So I need to make sure that he understands that I'm asking him a question, if I ask him a "what" question, what I'm looking for. I just need – It's a way of preparing a witness so he can testify. My client's been - -
> THE COURT. Is it appropriate for counsel to prepare a witness in the middle of his testimony, direct, cross, recross, redirect?
> MR. GOULD. My client has been on the stand for four consecutive days and we've been divided up in trial time. Every time we come back to trial I have to re-prepare just to be able to come back into trial two weeks after the last one because we're having this trial over a period of time where there is a two-week interim. I just need to make sure that he understands what I'm asking when I'm asking him a question. That's my purpose in going through that with him. I certainly did ask questions of -- I asked Mr. Grande to go through his deposition testimony to demonstrate that Mr. Wild's cross of my client relying on Joe Grande's testimony was not quite

24

complete with the evidence. But I wasn't preparing him in his testimony. I wasn't asking him to change his testimony.

THE COURT. Have you or your client, Mr. Grande, been making sort of signals and gestures to Mr. Tomasulo throughout the testimony, kind of seeking to influence his answer?

MR. GOULD. I know that my -- Mr. Grande had, as you observed before.

THE COURT. Okay.

(N.T. 11/13/17, pp. 147-149).

This record is devoid of any bias, prejudice or other evidence tending to show the appearance of such bias or prejudice by the Court. The Court's decision herein is solely based on the commercial transactional documents in the evidentiary record, the testimony of all witnesses, and the Court's assessment of credibility thereof as required under Pennsylvania law.

### f. Damages

The purpose of damages in a breach of contract case is to return the parties to the position they would have been in but for the breach. Birth Center v. St. Paul Companies, Inc., 787 A.2d 376 (Pa. 2001). "At common law, the mitigation of damages in a lease was regarded as being controlled by property law. Because the lease was a conveyance of real property, the tenant owned a non-freehold estate, and the landlord had no duty to mitigate damages arising from the tenant's breach of the lease." Id. In a breach of contract action, damages must be proven with reasonable certainty. Spang & Co. v. U.S. Steep Corp., 545 A.2d 861, 866 (Pa. 1988).

Our Supreme Court has held that a non-breaching landlord whose tenant has abandoned the property in violation of the lease does not have a duty to mitigate damages under a commercial lease. *See* Stonehedge Square Limited Partnership v. Movie Merchants Inc., 715 A.2d 1082 (Pa. 1998). In *Stonehedge*, the Supreme Court of Pennsylvania stated:

> In 1882 this court held that "if the relation of landlord and tenant was not ended by contract, he was not bound to rent to another during the term for relief of the defendant." Milling v.

25

Becker, 96 Pa. 182 (1880). Two years later, in Auer v. Penn, this court held that "[t]he landlord may allow the property to stand idle, and hold the tenant for the entire rent; or he may lease it and hold him for the difference, if any." Id., 99 Pa. 370, 375–76 (1882). And in 1928 this court held that "[r]eletting is not imposed on a landlord as a duty." Ralph v. Deiley, 293 Pa. 90, 141 A. 640, 643 (1928).

Stonehedge, 715 A.2d at 1084.

In summary, where a commercial tenant abandons property, a non-breaching commercial landlord has no duty to mitigate damages. Id. The Superior Court stated:

*Stonehedge* does not disturb the general principle that a landlord must choose between taking possession of the property and collecting future rents. However, pursuant to that decision, where a commercial tenant vacates the leasehold, the landlord may seek accelerated rent if the lease so provides, and re-let the premises. The landlord, however, must credit tenant at execution for sums paid by the replacement tenant. The Restatement (Second) of Property similarly treats such situations where a landlord seeks both accelerated rent and possession. If the landlord terminates the lease and evicts the tenant before the acceleration clause is enforced, the landlord cannot recover rent for the post-eviction period. If the landlord collects accelerated rent and receives possession of the property by abandonment, the landlord may keep the accelerated rent, but is required to account to the tenant for rent received from a new tenant. If the tenant abandons the property, the landlord may sue and collect accelerated rent. However, the landlord must account to the tenant for rent from a new tenant. *See* Restatement (Second) of Property, § 12.1, Comment k.

Ferrick v. Bianchini, 69 A.3d 642, 656 (Pa. Super. 2013).

"A tenant may agree, when entering into a lease, that the maturity of rent may be accelerated; the parties may agree that the whole rent for the term may be payable in advance or that it shall become payable at once on default of payment periodically, in accordance with the terms of the contract, or that it may become due if the tenant remove or attempts to remove from the premises before the end of the term, without having paid the rent for the term. On the happening of the contingency provided

26

for, the rent that was theretofore payable by installments becomes immediately due as provided in the lease." Brumbaugh v. Feldman, 47 Pa. Super. 10, 16 (1911). "If the landlord terminates the lease and evicts the tenant before the acceleration clause is enforced, the landlord cannot recover for the post-eviction period." Ferrick, 69 A.3d at 656. In Matovich v. Gradich, 187 A. 65 (Pa. Super. 1936), the Superior Court held that in cases where the lease contains an acceleration clause, the landlord can accelerate for future rent accruing under the lease or eject the tenant, but not both. *See* Matovich v. Gradich, 187 A. 65 (Pa. Super. 1936). "The tenant, then, does not forfeit all of his rights when the landlord accelerates, but must thereafter be accorded his possessory rights on payment of the accelerated rent." Id. at 66.

In the instant case, the parties executed and exchanged their commercial transactional documents at settlement on August 12, 2016. Defendants pledged their ownership and voting interests in Majestic as encumbered collateral to Main Street to guarantee all tenant Lease obligations (Pls.' Ex. 4). Tomasulo and Grande personally guaranteed for a three (3) year period the obligations under the Tenant's Lease which commenced on August 12, 2016. (Pls.' Ex. 2; N.T. 9/22/17, pp. 29, 57). Defendants' personal guaranty extends only for the first three (3) years of the five (5) year Lease term (Pls.' Ex. 2; N.T. 9/22/17, pp. 29, 57). The record clearly supports our finding that Defendants defaulted under the Lease after failing to tender the monthly Lease payments due for December 2016 and all months thereafter (See N.T. 6/23/17, pp. 36, 37). Due to Defendants' default of their obligations under the Lease, Plaintiffs filed this action demanding the Court award immediate possession of the Property to Main Street and Majestic.

Plaintiffs claim that in addition to establishing the elements for an ejectment action and their right for possession of the Property, they are also entitled to the unpaid rent and real estate taxes due together with the accelerated remaining balance of the three (3) year guaranty. Plaintiffs claim that unlike a commercial landlord which is required under Pennsylvania law to elect to either confess for

27

accelerated rent or, in the alternative, to confess for possession and accrued damages to date, Main Street needs not elect one (1) remedy or the other. Main Street argues they established the elements of an ejectment action and, in addition, are entitled under Pennsylvania law to also proceed against Guarantors under the contractual guaranty for their contractually based monetary damages.

The Court concludes Plaintiffs are entitled to immediate possession of the Property as a consequence of Defendants' default. The record indicates Defendants performed various repairs and/or improvements to the Property to operate their business. The Court finds Plaintiffs will repossess the Property and its contents as repaired and/or improved. As noted by Plaintiffs' own witness Sean Holmes:

> BY MR. GOULD:
> Q. Okay. Now, you've been able to go down and see what my clients have actually done with the inn, have you not?
> A. We had that right, sir.
> Q. So then you know that they have made substantial improvements to the inn. That they've made investments into the inn.
> A. I know they've made some -- yeah, they've done some work for sure, yeah.

(N.T. 9/22/17, p. 96).

Furthermore, under Section 8.2(b) of the Lease, Landlord agreed to use reasonable efforts to mitigate damages:

> Landlord shall use commercially reasonable efforts to mitigate damages hereunder; provided however, that Landlord shall not be obligated to: (1) lease the Premises to any replacement tenant that does not, in Landlord's reasonable opinion, have (a) sufficient financial resources, (b) operating experience or (c) good reputation in the business community; or (2) lease the Premises to any replacement tenant where the replacement tenant's use of the Premises would violate any mortgage, reciprocal easement agreement, other encumbrances on the Premises; or (3) lease of the Premises for any rental below the fair market rental for the Premises or be required to renovate or improve the Premises.

(Pls.' Ex. 2, pp. 17-18).

28

Additionally, when addressing a claim for attorneys' fees in the context of the breach of a lease, the Superior Court of Pennsylvania has held:

> The general rule in this Commonwealth is that there is no recovery of attorney's fees from an adverse party in the absence of an express statutory authorization, clear agreement between the parties, or the application of a clear exception. Generally, landlords and tenants can include in a lease any terms and conditions that are not prohibited by statute or other rule of law. The Landlord and Tenant Act of 1951 does not specifically provide for the recovery of attorney's fees nor does it prohibit inclusion of a fee shifting provision in rental agreements. Furthermore, we are not presented with any applicable exceptions to the general rule. Consequently, the validity of the instant provision is solely dependent upon contract law. Where the language of a lease is clear and unequivocal, its meaning will be determined by its contents alone in ascertaining the intent of the parties.

Bayne v. Smith, 965 A.2d 265, 267 (Pa. Super. 2009).

The Court will accordingly award Plaintiffs immediate possession of the Property together with monetary damages based upon the unpaid rent through April 2018, including contractual late fees, interest and unpaid real estate taxes. The Court finds from the record that Plaintiffs are contractually entitled to reasonable attorneys' fees and costs as may subsequently be determined due and owing before the Court. The Court will not grant Plaintiffs the balance of the three (3) year guaranty as requested, nor will the Court consider the unfunded escrow account balance as an element of Plaintiffs' damages as the Court finds that Defendants' collective overall fit-outs, Key Money improvements and additional repairs to the Property offset those specific claims. This decision is entered subject to the possibility that future damages, if any, incurred by Plaintiffs may be subject to reassessment by the Court.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Main Street's immediate possession of the Property. The Court further concludes Defendants unlawfully withheld contractual rent payments

29

due since December 2016 and all months thereafter. Defendants were fully aware of the Lease payment default and the transactional documents evidence the Liquor License was subject to a collateral pledge. At no time have Defendants cured the Lease payment default, nor did Defendants seek to pay any monthly rents into an escrow account while the parties attempted to resolve their differences. Finally, the Court finds no default by the Landlord under the Lease and Tenant was not entitled under the Lease or Pennsylvania law to withhold rent.

For the foregoing reasons, the Court enters the following Order:

## ORDER.

**AND NOW,** this 13th day of **April, 2018,** based on the facts and reasons as set forth above, it is hereby **ORDERED** and **DECREED**:

1. Judgment is entered in favor of Plaintiff(s) and against Defendants Kristian R. Tomasulo and Joseph Grande, Jr. and Occupants for immediate possession of the Property located at 9 S. Main Street, New Hope, Pennsylvania 18938.

2. Verdict is entered in favor of Plaintiff(s) and against Defendants in the amount of Two Hundred Forty-Nine Thousand One Hundred Fifteen Dollars and Eighty-Nine Cents ($249,115.89) plus reasonable attorneys' fees and costs as may subsequently be determined due and owing.

3. Verdict is entered in favor of Plaintiff(s) and against Defendants on all Counterclaims.

BY THE COURT:

_____
JEFFREY G. TRAUGER, JUDGE

Date: April 13, 2018

OF BUCKS COUNTY
PROTHONOTARY

2018 APR 13 A 11: 17

RECEIVED